In re Ernest Sumio UYEHARA, Debtor.

James L. ZAHN, Plaintiff,

v.

Ernest Sumio UYEHARA, Defendants.

Bankruptcy No. 82–00242.
Adv. No. 82–0121.

United States Bankruptcy Court,
D. Hawaii.

July 26, 1984.

Lee Miki, Honolulu, Hawaii, for debtor.

Ronald Tongg, Honolulu, Hawaii, for plaintiff.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW RE: COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT

JON J. CHINEN, Bankruptcy Judge.

Creditor James L. Zahn brings the instant complaint, requesting the Bankruptcy Court to hold the debt owing by Ernest Sumio Uyehara ("Debtor") to James L. Zahn ("Creditor") nondischargeable pursuant to Sec. 523(a)(2) of the Bankruptcy Code. A hearing was held on February 10, 1984, at which time Ronald Tongg, Esq., represented Creditor and Lee Miki, Esq., represented Debtor. Based upon the evidence adduced, the memoranda filed, the records herein and argument of counsel, the Court makes the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

1. Plaintiff and Defendant are both residents of the City and County of Honolulu, State of Hawaii.

2. Plaintiff is and at all times relevant hereto was a self-employed architect, and Defendant was at all times relevant hereto a general contractor and developer.

3. During 1979, Kenny Kaneshiro representing Kenny & Family Enterprise, Inc., (hereafter "Kenny"), approached Debtor to develop the property on South King Street, Honolulu, Hawaii, ("Premises") in which Kenny had a lease-hold interest. Debtor subsequently took steps to acquire the development rights to said premises.

4. Sometime in 1980, Debtor was working with Creditor on another project. When Creditor learned of Debtor's plan to develop a high-rise building on the Premises, Creditor expressed an interest in the project as an architect.

5. When Kenny Kaneshiro became ill, he asked Debtor to work with his daughter, Kathleen Vega, to help his family by developing the Premises.

6. After much negotiation, Debtor obtained a written agreement from Kenny concerning the Premises on June 22, 1981, modified on June 26, 1981.

7. Debtor also obtained oral agreements with Mr. and Mrs. Peter Schubert ("Schuberts") and Mr. Angelo Vicari, ("Vicari") the fee owners of the Premises and of an adjoining property, concerning development of the Premises. These agreements with the fee owners were not in writing.

8. Shortly after commencing negotiation with Kenny, Schuberts and Vicari, Debtor began negotiating with Dave's International Properties, Inc. ("Dave's") regarding development of the Premises. Dave's offered Debtor $1 million to purchase from Debtor the development rights to the Premises. However, when Debtor discussed Dave's proposal with Creditor, Creditor suggested $2 million, which was accepted by Dave's.

10. After an agreement with Dave's had been signed on July 10, 1981, Debtor discussed the terms and showed the signed agreement to Creditor.

11. From 1979 through 1981, Debtor spent all of his time on the development of the Premises, and thus had no income. In July of 1981, being low on cash, Debtor requested some money from Creditor for his living expenses.

12. As a result, Creditor agreed to advance a total of $28,000.00 to Debtor. And here lies the dispute between Creditor and Debtor. Creditor contends that he agreed

to advance the $28,000.00 to Debtor on Debtor's representation that the said sum shall be placed in escrow as a deposit for the acquisition of the Premises. On the other hand, Debtor contends that there was no restriction on the use of the $28,000.00. Debtor states that, because Dave's had already agreed to pay for all costs of developing the Premises, including the acquisition of the Premises by lease or otherwise, there was no need for him to spend any money on the project. Debtor also contends that Creditor was aware of the agreement with Dave's wherein Dave's agreed to bear all costs of acquisition.

13. On July 27, 1981, Creditor and Debtor entered into a written agreement to co-develop the Premises. As his share, Creditor was to be paid a professional architectural fee of $950,000, plus $450,000 from Leaf Construction, Inc. and was to receive an office condominium free, upon completion of the project. The agreement further provided that Creditor was to pay Debtor $14,000.00 upon execution of the Agreement and an additional $14,000.00 when Debtor acquired the Premises by purchase or a long term lease for the project. There was no restriction on the use of this $28,000.00 in the agreement itself.

14. Although the July 27, 1981 agreement provided for payment of $14,000.00 by Creditor to Debtor upon execution, Creditor paid only $5000.00, with an agreement to pay $9000.00 within 10 days. However, the $9000.00 was not paid as agreed.

15. On August 28, 1981, Creditor and Debtor modified the July 27, 1981 agreement. Under this modified agreement, Creditor was to receive an office condominium and a total of $1,650,000.00, an increase of $250,000.00 over the July 27, 1981 agreement. Also, under this August agreement, Creditor agreed to pay the $23,000.00 balance of the aforementioned $28,000.00 to Debtor. Debtor testified that he agreed to this proposal because Creditor wanted a larger return from the development project before he would advance the balance of $23,000.00. The Creditor knew that Debtor was in a financial bind.

16. Subsequent to August 1981, rising interest rates rendered Dave's unable to perform and Debtor was told to find another purchaser.

17. Debtor then unsuccessfully attempted to form a limited partnership to proceed with the development. Eventually, the project failed for lack of financing.

## CONCLUSIONS OF LAW

1. 11 U.S.C. § 523(a)(2)(A) which applies to the instant case provides:

(a) A discharge under Section 727, 1141 or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for obtaining money, property, services or an extension, renewal, or refinance of credit by—

(A) false pretenses, false representation, or actual fraud other than a statement respecting the debtor's or an insider's financial condition.

2. The burden is on Creditor to prove his case, and, in the instant case, Creditor has failed to prove that Debtor obtained the $28,000.00 from Creditor on Debtor's representation that said $28,000.00 would be deposited in escrow to purchase the Premises.

3. Creditor was aware that Debtor had spent considerable time and money on the project since 1980, that Debtor had no income and was in need of cash for living expenses.

4. Creditor was also aware of the progress of negotiations to acquire the development rights to the Premises, was aware of the written agreement between Debtor and Dave's whereby the latter agreed to acquire the development rights to the Premises and to take care of all expense, including the costs of acquiring the Premises by lease or purchase.

5. Creditor's allegation that the $28,000.00 paid after the renegotiation on August 21, 1981 was to be deposited in escrow to acquire the Premises is inconsistent with

the evidence presented. Testimony revealed that Creditor demanded the renegotiation for a larger return from the proceeds before agreeing to pay the $28,-000.00. Creditor was aware of the arrangement with Dave's wherein Dave's would assume all costs, including those of acquiring the Premises. In addition, if the money were actually to have been used for acquisition of the Premises, Debtor could have insisted on payment without agreeing to increase Creditor's share of the project proceeds. However, because Creditor knew the cash was needed by Debtor for living expenses, Creditor insisted on a larger share of the project proceeds before paying the cash. Debtor capitulated to Creditor's demands because of his financial condition.

Based on the foregoing it is hereby found that no violation of Section 523(a) of the Bankruptcy Code has been established by Creditor, that the debt to Creditor is dischargeable, and that Debtor is entitled to judgment against Creditor for reasonable attorney's fees and costs, to be granted upon submission of proper timesheets.

Let Judgment be entered accordingly.